UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHELLEÉ MUTUA, | ) | CIV. 09-4080-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING IN PART |
| vs. | ) | AND GRANTING IN PART |
| | ) | DEFENDANTS' SUMMARY |
| TEXAS ROADHOUSE | ) | JUDGMENT MOTION |
| MANAGEMENT CORP., | ) | |
| MURRAY WELDER, and | ) | |
| THOMAS SCHEEL, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Michelleé Mutua, an African-American female, filed an employment discrimination suit against her employer, Texas Roadhouse, the Sioux Fall store's managing partner, Murray Welder, and the Sioux Falls market partner, Thomas Scheel (defendants). Mutua alleges discrimination and retaliation claims under 42 U.S.C. § 1981, Title VII, and the South Dakota Human Rights Act, and a breach of contract claim under South Dakota state law. Mutua also seeks punitive damages. Defendants move for summary judgment on all claims. The motion is granted in part and denied in part.

## BACKGROUND FACTS

In the light most favorable to Mutua, the nonmoving party, the facts are as follows:

Mutua is an African-American female who began working as a server and trainer at the Sioux Falls Texas Roadhouse in June of 2006, when the restaurant first opened. On June 8, 2008, Mutua was working as a server when the customers at one of her tables requested a different server because the guests did not want an African-American server. The manager on duty removed Mutua from the table and replaced her with a white server. Mutua spoke with Welder about the incident the next day and he promised to investigate the situation and discuss it with the corporate office.

On June 12, 2008, the same guests returned to the restaurant, no supervisor spoke with them about the June 8 incident, and a white server was assigned to wait on them. When the same customers again returned on June 15, 2008, numerous servers declined to serve their table because of the previous incident. The next day, Welder told Mutua that the corporate office indicated that guests can ask for a different server based on race. On June 19, 2009, Mutua followed Texas Roadhouse's policy and filed a report with Ethics Point, Texas Roadhouse's human resources department. Four days later, Welder apologized to Mutua for the incident and told her that he would never again take a server off his or her table if a similar incident occurred. Welder also told her that customers who discriminated on the basis of race were not needed. On June 25, 2008, Mutua received an email response from Ethics

Point informing her that Scheel had been notified of her claim and that he would address the matter.

On July 19, 2008, the same guests returned again and a white server was assigned to their table. When Mutua asked the manager on duty (Emily Erickson) why the guests could return, Erickson told Mutua that the guests were welcome and that Mutua should speak with Welder. On July 21, 2008, Mutua spoke to Welder, who informed her that the corporate office told him that the restaurant was prohibited from asking any guests to leave based on their discriminatory remarks.

On September 3, 2008, Mutua filed a charge of discrimination with the South Dakota Department of Labor, Division of Human Rights, and the Equal Opportunity Employment Commission (EEOC) based on discrimination against her on the basis of race and color. On October 8, 2008, Mutua and her counsel and Texas Roadhouse through its representative, Dee Shaughnessy, the Director of Care and Concern, met with an investigator from the South Dakota Division of Human Rights. A negotiated settlement was reached subject to Shaughnessy having twenty-four hours to obtain authority for the monetary portion of the settlement. The next day, Shaughnessy requested an extension until October 22, 2008. On October 24, 2008, Shaughnessy made a different offer to settle that was now contingent upon Mutua's immediate resignation. Mutua rejected this offer on October 27, 2008.

While Mutua's charge was pending, management sent Mutua home on October 22, 2008, for being late to work. On October 24, 2008, management asked Mutua to leave her shift for having a bad attitude and told her to return for a meeting on October 25, 2008. When Mutua returned on October 25, 2008, Welder suspended her from work until she spoke with Scheel. Mutua met with Scheel on October 28, 2008, and he told her that she was being terminated due to customer complaints and having a bad attitude. On December 3, 2008, Mutua filed a second charge of discrimination contending that she was retaliated against and that she suffered an adverse employment action when she was fired.

On December 4, 2008, the South Dakota Division of Human Rights found probable cause to believe that Mutua had been discriminated against as alleged in her first complaint. On February 17, 2009, the Division of Human Rights determined that there was probable cause on the second complaint. The EEOC issued a Notice of Right to Sue for both discrimination complaints on May 29, 2009. Mutua filed this suit in June of 2009.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case will preclude

4

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). On a summary judgment motion, the court views the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted). Similarly, the nonmoving party receives "the benefit of all reasonable inferences to be drawn from the underlying facts" in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

Evidence based on inferences is acceptable in an employment discrimination case. *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). Because the court is especially deferential to plaintiffs who base their evidence on inferences, "summary judgment should seldom be used in employment-discrimination cases." *Id.*; *see also Lynn v. Deaconess Med. Center-West Campus*, 160 F.3d 484, 486-87 (8th Cir. 1998) (reasoning that the court should "keep in mind the caution that summary judgment should seldom be used in discrimination cases.").

**DISCUSSION**

## I.  The Discrimination Claims

Mutua alleges racial discrimination under 42 U.S.C. § 1981, Title VII, and the South Dakota Human Rights Act, SDCL 20-13-10. Racial discrimination claims under Title VII and § 1981 are nearly identical and should be analyzed under a similar framework. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997). Additionally, racial discrimination claims under Title VII and SDCL 20-13-10 are analyzed under the same framework. *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1050 n.1 (8th Cir. 2002) (holding that federal and state discrimination laws should be analyzed under the same framework); *Huck v. McCain Foods*, 479 N.W.2d 167, 179 (S.D. 1991) ("[W]e now expressly acknowledge . . . that SDCL 20-13-10 is comparable to the corresponding provision in Title VII"). This case initially presents an issue of first impression, namely whether at-will employees in South Dakota have a cause of action under § 1981.

### A.  At-Will Employees in South Dakota May Sue Under § 1981

The parties dispute whether § 1981 applies to Mutua because she was an at-will employee under South Dakota law. Section 1981 prohibits employers from racially discriminating against employees in the making and enforcing of contracts. 42 U.S.C. §§ 1981(a) and (b). While § 1981 prohibits discrimination, it "does not provide a general cause of action for race discrimination." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001).

Section 1981 only protects against racially-charged discrimination that interferes with the making and enforcement of contracts. 42 U.S.C. § 1981(a). In 1989, the Supreme Court narrowly interpreted "make and enforce" to only prohibit discriminatory conduct in *making* a contract. *Patterson v. McLean Credit Union*, 491 U.S. 164, 176-77 (1989).

In 1991, Congress amended § 1981 in direct response to *Patterson*. *Skinner v. Maritz, Inc.*, 253 F.3d 337, 339 (8th Cir. 2001) (discussing the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071). "Make and enforce" now includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "Thus, § 1981 provides protection for violations that occur from the inception until the conclusion of the contractual relationship." *Turner v. Ark. Ins. Dep't*, 297 F.3d 751, 755-56 (8th Cir. 2002) (citation omitted). Plaintiffs, however, "must initially identify an impaired 'contractual relationship.' " *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477 (2006).

The Eighth Circuit has noted that "the legislative history of § 1981 underscores Congress's intent to include at-will employees." *Skinner*, 253 F.3d at 340 n.1 (citing the congressional record on § 1981); *see also Turner*, 297 F.3d at 756 (reasoning that *Patterson* "leaves no doubt that the Court considered the employee's [at-will] relationship with her employer to be a contractual one for purposes of § 1981." (citing *Fadeyi v. Planned Parenthood*

7

*Ass'n. of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir. 1998))). According to the Eighth Circuit, it is "clearly established" that an at-will employee can sue for employment discrimination under § 1981. *Id. Skinner* and *Turner* are in line with the other circuits that have addressed this issue.[1]

The Eighth Circuit requires a district court to apply the forum state's contract law to determine if a § 1981 contractual relationship existed. *See Skinner*, 253 F.3d at 338-39 (applying Missouri law and finding that a contract existed for a § 1981 claim alleged by an at-will employee). "[F]or purposes of § 1981, an employment-at-will relationship is considered a contractual one even though an independent state law contract may not exist." *Turner*, 297 F.3d at 756 (applying Arkansas law and finding a contractual relationship existed for an at-will employee under § 1981).

South Dakota requires four elements for a valid contract: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration. SDCL 53-1-2. Contracts can be express or implied. SDCL 53-1-3. "An implied contract is one, the existence and terms of which are manifested by conduct." *Id.* Mutua did not have an express, written contract

---

[1] *See, e.g.*, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 398-99 (7th Cir. 2007) (holding that an at-will employee may allege a § 1981 claim)*; Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 261-62 (2d Cir. 2000) (same); *Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir. 1999) (same); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018-19 (4th Cir. 1999) (same); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1051-52 (5th Cir. 1998) (same).

with Texas Roadhouse, but she did have an implied contract. Both parties were capable of contracting, each party willingly gave consent to contract with the other party, and the object of the contract, employment, was lawful. For consideration, Mutua agreed to work for Texas Roadhouse. Texas Roadhouse agreed to pay Mutua her hourly wage.

Accordingly, even though Mutua was an at-will employee, she had a contract with Texas Roadhouse under § 1981. This holding is consistent with Congress's intent, Eighth Circuit precedent for claims that arose under Missouri and Arkansas law, and the other circuits that have addressed the issue. The court will now analyze Mutua's § 1981and SDCL 20-13-10 claims under the Title VII framework.

### B. Mutua Has Alleged Sufficient Facts that a Jury Should Determine Whether a Hostile Work Environment Existed

Mutua claims discrimination under Title VII, § 1981, and SDCL 20-13-10 and all three statutes provide a cause of action for a hostile work environment claim. *Edwards v. Jewish Hosp. of St. Louis*, 855 F.2d 1345, 1349 (8th Cir. 1988) (reasoning that in enacting § 1981, "Congress took aim at *discrimination* in employment, from whatever source"); *Huck v. McCain Foods*, 479 N.W.2d 167, 170 (S.D. 1991) (finding that SDCL 20-13-10 gives rise to a hostile work environment claim); *Moylan v. Maries Cnty.*, 792 F.2d 746, 751 (8th Cir. 1986) (reasoning that a hostile work environment violates Title VII, 42 U.S.C. § 2000e-2(a)(1)).

A hostile work environment claim based on racial discrimination requires an employee to make a five-part showing: (1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Tatum v. City of Berkeley*, 408 F.3d 543, 550 (8th Cir. 2005).

The first element of Mutua's prima facie case is not in dispute. Mutua is an African-American female, and thus, is part of a protected class. *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000). The parties also do not dispute that the white customers asked for a white server because they did not want to be served by an African-American server, the customers returned on at least three other occasions, and the cusotmers were always served by white servers. Thus, the second element, unwelcome harassment, is met. Similarly, element three, that the harassment was based on race, is undisputed because the customers stated that they did not want an African-American server.

Element four requires that the harassment affect a term, condition, or privilege of employment. The employee must show that the offending conduct created an objectively hostile environment and that she subjectively perceived the working conditions as abusive. *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997). There is evidence that Mutua subjectively perceived her

working conditions as abusive because she complained to her supervisors and to Ethics Point about the discriminatory treatment.

In determining if the working environment was objectively hostile, the fact-finder views the situation from the totality of the circumstances. *Moyland*, 792 F.2d at 750 (citing *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). Because no bright line exists for hostile work claims, juries should generally determine whether the conduct was offensive enough to be considered hostile. *Hathaway*, 132 F.3d at 1221 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'" *Id.* at 1222 (quoting *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir. 1992)). "The harassment must be 'sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.'" *Moyland*, 792 F.2d at 750 (quoting *Henson*, 682 F.2d at 904). The harassment must be a practice or pattern and, generally, an employee must "show that the harassment is sustained and nontrivial." *Id.* (citing *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983), *overruled on other grounds*).

The Supreme Court has announced factors to determine if the working environment was hostile: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Harris*, 510 U.S. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[T]he plaintiff must show that the conduct was discriminatory in nature and that she was singled out for such treatment on the basis of her membership in a protected category under the statute." *Hathaway*, 132 F.3d at 1221.

Mutua argues that the discrimination began on June 8, 2008, when customers at one of her assigned tables asked for a different server because they did not want to be served by an African-American server. A manager replaced Mutua with a white server. The next day, Mutua spoke to the managing partner of the restaurant, Welder, and he agreed that he would investigate the incident and discuss it with the corporate office. But when the same customers returned on June 12, 2008, the issue was not addressed by management. Three days later, the same customers returned again. On June 16, 2008, Welder told Mutua that the corporate office informed him that guests can request a different server based on race.

On June 23, 2008, Welder apologized to Mutua for the June 8 incident and told her that the restaurant did not need a customer who discriminated based on race and that it would never happen again. But when the same customers again returned on July 19, 2008, they received a white server. The manager on duty, Emily Erickson, told Mutua that the customers in question

were welcome in the restaurant. When Mutua spoke to Welder about the situation on July 21, 2008, Welder told her that the corporate office said they were prohibited from asking guests to leave based upon their discriminatory requests.

The discriminatory conduct not only occurred on June 8, 2008, when the customers requested a different server, but also happened three more times between June 8 and July 19, 2008. A jury could find that a customer's continued discriminatory conduct and Texas Roadhouse's acquiescence to that discriminatory conduct was sufficiently humiliating to Mutua to create a hostile work environment. This situation could also have unreasonably interfered with Mutua's work performance. Viewing the totality of the circumstances, a jury could find that the harassment was sufficiently pervasive to create a hostile working environment.

The fifth element requires Mutua to show that defendants had knowledge of the harassment and failed to remedy the situation. There is no dispute that defendants had knowledge. Mutua complained directly to Welder. She also followed company procedure by contacting Ethics Point. In turn, Ethics Point informed Scheel about the situation. No one took action to stop the customers' discriminatory actions toward Mutua while they were eating at Texas Roadhouse on four separate occasions. Thus, Mutua has put forth sufficient evidence to make a prima facie case of a hostile work environment.

Defendants dispute whether they had an obligation to remedy the situation. Defendants, citing *Fulmore v. Home Depot, U.S.A., Inc.*, No. 1:03 CV 0797, 2006 WL 839459 (S.D. Ind. Mar. 30, 2006), argue that a customer's discriminatory conduct cannot be imputed to them. In *Fulmore*, a customer called an African-American employee a "n***er" and told him to "go ahead and act [your] color." *Id.* at *3. The court found that the customer's actions could not be imputed to the employer, stating that "[w]hile the racial harassment of employees by customers is deplorable . . . neither this court nor any other has imposed upon employers the obligation to reprimand or otherwise punish customers . . . *when the employee is no longer being subjected to the harassment.*" *Id.* at 16 (emphasis added).

As acknowledged in *Fulmore*, however, "discriminatory harassment by a customer or patron can be evidence of a hostile environment claim where the employer ratified or condoned the conduct by failing to investigate and remedy it after learning of the conduct." *Id.* at *15. Other courts have similarly found that an employer may be responsible for discriminatory harassment by a customer or patron. *See Galdamez v. Potter*, 415 F.3d 1015, 1022-25 (9th Cir. 2005) (the employer may be responsible for actionable third-party harassment of its employees); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001) (employer may be responsible for sexual harassment toward employees by acts of nonemployees); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997) (employer may be responsible for sexual harassment

14

toward employees by acts of nonemployees); *Rosenbloom v. Senior Res., Inc.*, 974 F. Supp. 738, 743-44 (D. Minn. 1997) ("employer can be held liable for the racial hostile work environment created by a third party."). As the Eighth Circuit noted in *Crist*, the employer's liability turns on whether the employer was aware of the conduct and whether it responded in a timely and appropriate manner. 122 F.3d at 1111.

In the present case, the customers engaged in discriminatory conduct by refusing to be served by an African-American server and Mutua reported the discriminatory conduct to her supervisor, who ultimately told her that it was Texas Roadhouse's policy to allow guests to ask for a different server on the basis of race. The alleged discrimination was not an isolated incident and in fact, Mutua was informed that it was company policy. The alleged discrimination was repeated on three additional occasions. There is a jury question as to whether the steps taken by Texas Roadhouse to assign only white servers to the customers on four separate occasions ratified or condoned the discriminatory conduct and/or whether Texas Roadhouse had remedied the discriminatory conduct. Thus, summary judgment on the hostile work environment claim is denied.

## C. Mutua Has Alleged Insufficient Facts to Sustain Summary Judgment on Her Disparate Treatment Claim

A disparate treatment claim can be brought under Title VII, § 1981, and SDCL 20-13-10. *See Philip v. Ford Motor Co.*, 413 F.3d 766, 767 (8th Cir. 2005)

(discussing a disparate treatment claim under Title VII); *Edwards*, 855 F.2d at 1349 (reasoning that in enacting § 1981, "Congress took aim at *discrimination in employment, from whatever source*"); SDCL 20-13-10 ("It is an unfair or discriminatory practice for any person, because of race . . . to accord adverse or unequal treatment to any person or employee with respect to . . . any term or condition of employment."). An employee can use either direct or indirect evidence to support a disparate treatment claim. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

### 1. Mutua Has Alleged Insufficient Direct Evidence to Prove a Disparate Treatment Claim

Direct evidence must show a "specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *King v. Hardesty*, 517 F.3d 1049, 1057 (8th Cir. 2008) (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). " '[A]n adverse employment action must be one that produces a material employment disadvantage.' " *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007) (quoting *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016-17 (8th Cir. 1999)). " 'Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge.' " *Id.* (quoting *Kerns*, 178 F.3d at 1016-17). "Minor changes in duties or working

conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong." *Id.* (citing *Baucom v. Holiday Cos.*, 428 F.3d 764, 767 (8th Cir. 2005)).

Mutua admits that she has no evidence that her pay or benefits were reduced. She alleges that her termination was caused by the retaliatory actions of defendants and not by her disparate treatment. Because there is no evidence of a material employment disadvantage, Mutua is unable to proceed forward under a direct evidence method of proving disparate treatment.

### 2. Mutua Has Alleged Insufficient Facts to Prove That Indirect Evidence Supports a Disparate Treatment Claim

Mutua can also show disparate treatment under the *McDonnell Douglas* burden-shifting analysis by making a four-part showing: "(1) [s]he is a member of a protected class; (2) [s]he met the legitimate expectations of [her] employer; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees that were not members of the protected class were treated differently." *Philip*, 413 F.3d at 768 (citing *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003)). If Mutua makes this showing, the burden then shifts to defendants to show that they had a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If defendants meet this standard, the burden then shifts back to Mutua to show that defendants' "proffered justification is merely a pretext for discrimination." *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005).

As stated in the direct evidence analysis, a plaintiff must suffer a material employment disadvantage, but Mutua has not stated sufficient evidence to meet this element. Because Mutua cannot make out a prima facie case of disparate treatment, no genuine issues of material fact remain and summary judgment is granted on the disparate treatment claim.

## II. Retaliation

### A. Direct Evidence of Retaliation Is Inapplicable

Mutua also claims that defendants retaliated against her after she filed her charges of discrimination, in violation of Title VII, § 1981, and SDCL 20-13-10. Retaliation claims under all three statutes are analyzed using the same framework. *Ross*, 293 F.3d at 1050 n.1; *Huck,* 479 N.W.2d at 179.

A plaintiff prevails on a retaliation claim if she can show that the discrimination was a "motivating factor" in the challenged employment decision. 42 U.S.C. § 2002e-2(m). A plaintiff may meet her evidentiary burden through either direct or indirect evidence. *Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1142 (8th Cir. 2008). Mutua does not allege direct evidence of retaliation, but rather relies on indirect evidence.

### B. Mutua Has Alleged Sufficient Indirect Evidence to Meet Her Evidentiary Burden

A retaliation claim based on indirect evidence uses the *McDonnell Douglas* burden-shifting analysis. *Smith v. Fairview Ridge Hosp.*, No. 08-1924, 2010 WL 4226529, ____ F.3d ___, ____, (8th Cir. Oct. 27, 2010). A plaintiff

alleging retaliation has the burden to present a prima facie case by showing that: "(1)[she] engaged in statutorily protected activity; (2) an adverse employment action was taken against [the plaintiff]; and (3) a causal connection exists between the two events." *Id.* (citation omitted). Once the plaintiff meets her burden, the burden then shifts to the employer to show there was a legitimate, nondiscriminatory reason for the adverse employment action. *Baker v. Mo. Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008) (citing *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006)). If the defendant makes this showing, the burden shifts back to the plaintiff to show that the proffered reasons are mere pretext for discrimination. *Id.* (citing *Clark*, 460 F.3d at 1067).

Mutua filed a discrimination claim with the South Dakota Division of Human Rights on September 3, 2008. In that document, Mutua alleged that on June 8, 2008, customers requested a different server on the basis of her race and color. Management took her off of her table and replaced her with a white server. Mutua's filing of an EEOC complaint is protected activity. *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006). Thus, Mutua has met her burden under element one.

Texas Roadhouse, through Scheel and Welder, later terminated Mutua. Termination is an adverse employment action and prohibited under the anti-discrimination statutes. *Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007)

("termination . . . unquestionably constitutes an adverse employment action"). Element two is met.

Element three requires a causal connection between the protected activity and the adverse employment action. "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of these two events." *Peterson v. Scott Cnty.*, 406 F.3d 515, 524 (8th Cir. 2005).

Mutua first filed a discrimination complaint with the EEOC on September 3, 2008, for the incident on June 8, 2008, and for defendants' failure to remedy the continuing discrimination. The parties reached an initial settlement on October 8, 2008, that would have allowed Mututa to retain her job, but they still had to determine the amount of monetary compensation. Defendants' counsel requested until October 22, 2008, to reply to the settlement. Mutua received a response on October 24, 2008, when defendants' counsel offered her $1,000 for pain and suffering and $4,277.76 in severance pay if she would resign immediately. Mutua refused this offer on October 27, 2008.

On October 22, 2008, while her EEOC complaint was pending, management sent Mutua home from work for being late to work. On October 24, 2008, management sent Mutua home from work for having a "bad attitude." On October 25, 2008, Mutua was suspended from work until she spoke with Scheel. Three days later, on October 28, 2008, Mutua was

terminated from work, allegedly for receiving customer complaints and having a bad attitude.

Within less than two months of filing a discrimination complaint, before the EEOC's issuance of its probable cause determination, and immediately after the parties failed to reach a settlement, defendants terminated Mutua's employment. This time period is sufficient for a jury to find that there was a causal connection between the protected activity and the adverse employment action. Consequently, Mutua has made out a prima facie case.

Defendants argue that they had non-discriminatory reasons for terminating Mutua. They allege that Mutua had a long history of infractions at Texas Roadhouse: on December 31, 2007, her supervisors wrote her up after she rudely commented on and refused a tip from a customer; on May 25, 2008, a manager noted that she was rude to customers and slammed their drinks on the table; on August 13, 2008, customers complained that Mutua threw their plates on the table; on August 31, 2008, Mutua's managers wrote her up for being late and for being combative; on October 24, 2008, Mutua engaged in an argument with the kitchen manager and another manager and, after being informed she was being sent home, yelled "I want my f***ing money," referring to her tips.

Defendants also allege that she had a long history of similar infractions with other employers. While this testimony is not disputed by Mutua, defendants had no knowledge of these infractions at the time they terminated

her, so the evidence is immaterial to finding a nondiscriminatory reason for the termination. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason.").

Mutua argues that defendants' proffered reasons are pretextual. In response to the tardiness issues, not only does Mutua allege facts to create genuine issues of material fact about her tardiness, but she also argues that white employees were not disciplined for tardiness while she was. Regarding the alleged behavioral issues, Mutua not only disputes the facts of every incident, but she also argues that she had a positive work history. She was responsible for training new staff, even a few days before her termination. Her managers also reported positive comments in the Texas Roadhouse Manager Log. Mutua contends that the increased write-ups around the time that Texas Roadhouse decided not to settle with her on the EEOC complaint without her resignation are, at a minimum, suspect.

Further, Mutua alleges that there were other examples of racism at Texas Roadhouse. Josh Dura, a former African-American server, once asked Welder why the restaurant did not serve the beverage Hi-C. Welder responded that the restaurant was "not here to promote Black people" and "only Black people drink Hi-C." On a different occasion, Dura received a "perfect check" and told Welder he was trying to get into a management position. Welder responded that

22

he would have to see if there were any "HNIC" name tags for him, meaning "head n***er in charge." Welder admitted to using the statement and acknowledged that HNIC can mean what Mutua claims, but also that it means "head nurse in charge."

The court must view the evidence in the light most favorable to Mutua. Read in that light, Mutua has carried her burden in showing that the reasons offered by defendants could be mere pretext and that she was terminated because she filed a discrimination complaint with the EEOC and South Dakota Division of Human Rights. Consequently, summary judgment is denied on Mutua's retaliation claim.

## IV.    Liability for the Individual Defendants

Mutua alleges that Texas Roadhouse, Scheel, and Welder are liable under § 1981 and SDCL 20-13-10 and that Texas Roadhouse is liable under Title VII. Welder and Scheel argue that they have no personal liability under § 1981 and SDCL 20-13-10.

The South Dakota Supreme Court has not reached the issue of whether supervisors can be individually liable under SDCL 20-13-10. This court has addressed this question in two other cases and held that the South Dakota Supreme Court would find individuals liable under SDCL 20-13-10. *See generally Johnson v. Gateway, Inc.*, No. CIV. 04-4186-KES, 2007 WL 1231657 (D.S.D. Apr. 24, 2007); *Stanley v. Hall*, No. CIV. 05-5104-KES, 2006 WL 3138824 (D.S.D. Oct. 31, 2006). "When a state's highest court has not

23

addressed the precise question of state law that is at issue, a federal court must decide 'what the highest state court would probably hold were it called upon to decide the issue.' " *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d at 377, 379 (8th Cir. 1995) (quoting *Hazen v. Pasley*, 768 F.2d 226, 228 (8th Cir. 1985)).

South Dakota law defines "employer" and "person" differently. *See* SDCL 20-13-1 (defining each term separately). SDCL 20-13-10 states that it is a "discriminatory practice for *any person*, because of race . . . to discharge an employee, or accord adverse or unequal treatment to any person or employee . . .) (emphasis added). The Iowa Supreme Court faced a similar statute and found that individual supervisors should be liable:

> The legislature's use of the words "person" and "employer" in section 216.6(1) and throughout the chapter, indicates a clear intent to hold a "person" subject to liability separately and apart from the liability imposed on an "employer." A contra interpretation would strip the word "person" of any meaning and conflict with our maxim of statutory evaluation that laws are not to be construed in such a way as to render words superfluous

*Vivian v. Madison*, 601 N.W.2d 872, 878 (Iowa 1999). The court finds this argument persuasive and adopts the reasoning in *Vivian*. *See Johnson*, 2007 WL 1231657, at *11 ("Although not controlling, the court finds that the well-reasoned opinion of *Vivian* provides support . . . that the South Dakota Supreme Court would interpret SDCL 20-13-10 to subject a supervisor to individual liability."); *Stanley*, 2006 WL 3138824, at *12-*13 (holding that

supervisors can be liable under SDCL 20-13-10). Welder and Scheel can be held personally liable under SDCL 20-13-10.

Next, the court will examine whether supervisors may be liable under § 1981. Title VII only subjects employers, not supervisors, to liability. *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1110 (8th Cir. 1998). But "[t]he lack of individual liability for discrimination under Title VII does not necessarily dispose of the issue of individual liability for discrimination claims under 42 U.S.C. § 1981." *Habben v. City of Fort Dodge*, 472 F. Supp. 2d 1142, 1155 (N.D. Iowa 2007). Rather, supervisors may be liable under § 1981 if they were personally involved in the discrimination. *Id.*

Mutua argues that Scheel ultimately made the decision to fire her and that he and Welder had knowledge of her pending EEOC and South Dakota Division of Human Rights discrimination complaints. While Scheel claims to have terminated Mutua because of her poor work performance, Scheel never previously spoke to Mutua about her work record. Mutua argues that Welder is liable for retaliation because Scheel did not get involved with day-to-day employment decisions unless Welder sought his help. When the discriminatory customers later returned to the restaurant after the incident on June 8, 2008, Welder also allegedly told Mutua, "Now I really have a problem. None of my servers want to take the table because of your situation." Docket 36 at 3. Mutua argues that Welder and Scheel determined that they would terminate her employment and, therefore, both supervisors are personally liable.

25

Scheel and Welder rely on Mutua's deposition and argue that they are not personally liable. During her deposition, Mutua stated that Welder "did not do anything to me. It was the corporation." Docket 36-7 at 84. According to Mutua, the only thing Scheel personally did wrong was that "[h]e fired me." Docket 36-7 at 84.

Firing someone is sufficient conduct under § 1981 and SDCL 20-13-10 for a jury to find Scheel personally liable. *See Cross v. Cleaver*, 142 F.3d 1059, 1077 (8th Cir. 1998) (upholding a verdict against a supervisor for retaliation because the supervisor had extensive authority over the employee, including the right to fire the employee). A jury could also find Welder personally liable because he asked Scheel to come to Sioux Falls from Burnsville, Minnesota, to fire Mutua. Thus, summary judgment is denied to both Scheel and Welder on the retaliation claim.

With regard to the hostile work environment claim, there is evidence that Welder allowed the discriminatory customers to return and enforced the company policy of allowing customers to discriminate against servers on the basis of race. There is evidence that Welder confirmed this policy with the corporate office. There is also evidence that Scheel was notified by Ethics Point of Mutua's claims and that he failed to take action to stop cusotmers from discriminating against servers at Texas Roadhouse. Thus, Scheel and Welder are denied summary judgment on this claim.

**V.    Mutua Has Alleged Sufficient Facts That a Jury Could Award Her Punitive Damages**

A plaintiff seeking punitive damages for intentional discrimination must first seek punitive damages under § 1981 before attempting to recover under Title VII. 42 U.S.C. § 1981a(a)(1). But punitive damages are available for violations of civil rights under Title VII. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (finding that Congress amended Title VII in 1991 to allow for punitive damage awards).

Even though the amount of punitive damages available differs between Title VII and § 1981, a plaintiff's burden for establishing punitive damages is the same under both statutes. *Kim*, 123 F.3d at 1063. An employee may only receive punitive damages if the employer acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981(b)(1). South Dakota similarly allows a plaintiff to recover punitive damages if "the defendant has been guilty of oppression, fraud, or malice, actual or presumed." SDCL 21-3-2.

Punitive damages under § 1981 may be assessed "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Kolstad*, 527 U.S. at 536 (internal quotation omitted). Because the punitive

damages standard is similar under South Dakota law,[2] the court will discuss all three statutes' punitive damages provisions together.

On the hostile work environment claim, Mutua argues that Welder knew that she had been removed from one of her tables because her white customers requested a different server based on her race. As her manager, she contends that Welder knew employees cannot be discriminated against on the basis of race or color, but he failed to remedy the situation when the customers repeatedly returned. Mutua contends that she followed the handbook's anti-discrimination policies because she reported the conduct to Welder and contacted Ethics Point, who then informed Scheel of her complaint. Neither Welder nor Scheel took action to protect her federally protected right not to be discriminated against while at the workplace.

Welder and Scheel argue that they did not act with malice or reckless indifference. Instead, they claim that they made good faith business decisions. Welder also argues that in her deposition, Mutua agreed that he did not act with malice.

---

[2] "Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991) (citing *Gamble v. Keyes*, 178 N.W. 870, 872 (S.D. 1920)). Implied malice occurs when the person acts willfully or wantonly and injures another. *Id.* "Willful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant." *Tranby v. Brodock*, 348 N.W.2d 458, 461 (S.D. 1984).

Mutua admitted in her deposition that she did not know what malice meant. She also stated that Welder never acted "mean toward" her. Docket 36-6 at 13. Mutua is not an attorney and her definition of malice is irrelevant. It is further irrelevant as to whether or not Welder was mean to her. What is relevant is that Welder and Scheel should have known that Mutua had the right not to be discriminated against while at her workplace. *See Kolstad*, 527 U.S. at 536. Welder had first-hand knowledge of the discrimination and allowed the discriminatory conduct of the customers to continue. A jury could find that Welder and Scheel acted in callous indifference to protect Mutua's federally protected right to work in a non-hostile environment.

On the retaliation claim, Mutua argues that Welder and Scheel should have known that they could not fire her for filing a discrimination complaint. Managerial supervisors are presumed to know that employees cannot be fired for filing discrimination complaints. *See Kolstad*, 527 U.S. at 536. Further, as managers, Scheel and Welder should have been aware of the Texas Roadhouse handbook that "forbid[s] any form of harassment of employees . . . because of a person's . . . race." Docket 36-7 at 7. Knowledge of a handbook forbidding discrimination is sufficient evidence for a jury to infer that a manager had knowledge of Title VII's prohibitions on racial discrimination and retaliation. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1009 (8th Cir. 2000).

Generally, employers are liable for the actions of their agents in an employment discrimination case. *Karlstad*, 527 U.S. at 545. The exception is

when the managerial agents' decisions "are contrary to the employer's good faith efforts to comply with Title VII." *Id.* (internal citation omitted). The Supreme Court, however, left for lower courts to determine what constitutes "good faith efforts." *Ogden*, 214 F.3d at 1009. In *Ogden*, an employer argued that it complied, in good faith, with Title VII because it had a written policy prohibiting discrimination and harassment. *Id.* at 1010. The court found, however, that the policy was insufficient to establish a good faith effort because the employer minimized the employee's complaints. *Id.*

At the time of the alleged discrimination, Texas Roadhouse had a written policy prohibiting all employment discrimination. But there is also evidence that the Texas Roadhouse corporate office told Welder that guests can request a different server on the basis of race. As the facts currently stand, the anti-discrimination policy is insufficient, as a matter of law, to establish good faith on the part of Texas Roadhouse. Accordingly, Mutua may proceed with her punitive damages claims.

## VI.    Mutua Cannot Assert a Breach of Contract Claim

Mutua also alleges a breach of contract claim under South Dakota law and seeks to enforce the anti-retaliation and anti-discrimination provisions in Texas Roadhouse's employee handbook. Defendants, relying on this court's decision in *Esser v. Texas Roadhouse Mgmt. Corp.*, No. CIV. 08-4004-KES, 2010 WL 396224 (D.S.D. Jan. 27, 2010), argue that the handbook does not create an implied promise that defendants would refrain from retaliating

30

against Mutua for filing a discrimination claim. In *Esser*, the employee argued that because Texas Roadhouse's employee handbook had provisions stating that employees had a duty to report discrimination and the employer would not retaliate against an employee who reported discrimination, an implied contract existed. *Id.* at *6 n.6. This court reasoned that these handbook provisions did not create a contract because " ' [a] promise to perform a legal duty is not consideration for a return promise.' " *Id.* (quoting Restatement (Second) of Contracts § 75 cmt. c).

Mutua only seeks enforcement of the anti-discrimination provisions in the "Texas Today" handbook, which prohibit racial discrimination and harassment. These provisions do not create an implied contract because Texas Roadhouse already must abide by Title VII and § 1981. Thus, summary judgment is granted to defendants on the breach of contract claim.

## CONCLUSION

Mutua has met her evidentiary burden to survive summary judgment on the hostile work environment and retaliation claims against Texas Roadhouse, Scheel, and Welder under SDCL 20-13-10 and § 1981 and against Texas Roadhouse under Title VII. Additionally, she has alleged sufficient facts for a jury to determine if she is entitled to punitive damages from Texas Roadhouse, Scheel, and Welder. Mutua, however, has not met her burden on her disparate treatment or breach of contract claims. Accordingly, it is

ORDERED that the defendants' motion for summary judgment (Docket 29) is denied in part and granted in part.

Dated November 10, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE